# EXHIBIT 1



## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### REPORT OF INVESTIGATION
### HHS-FDA-CFSAN-014-12

## I.  DESCRIPTION OF COMPLAINT

| | |
|---|---|
| Name of Complainant: | Kenneth Taylor<br>1668 Paris Oaks Road<br>Owings, MD 20736 |
| Complainant's Representative: | None |
| Title and Grade of Complainant's Position: | GS-14 Chemist |
| Name and Location of Agency and<br> Unit involved in Complaint: | Food and Drug Administration<br>Center for Food Safety and Applied<br> Nutrition<br>Office of Nutrition, Labeling and Dietary<br> Supplements<br>Division of Dietary Supplement<br> Programs<br>Dietary Supplement Regulations<br> Implementation Team<br>College Park, Maryland 20740 |
| Dates of Alleged Discrimination: | March 14, 2011; July 20, 2011 –<br>October 31, 2011; August 2011 –<br>October 2011; September 1, 2011;<br>January 24, 2012; January 27, 2012;<br>February 27, 2012; February 24-29,<br>2012 |
| Kind of Discrimination Alleged: | Age and Reprisal |
| Nature of action, decision, or condition<br> giving rise to complaint: | Harassment/hostile work environment |

## II.  DESCRIPTION OF INVESTIGATION

| | |
|---|---|
| Identity of Investigator: | Sylvia Drummond<br>Delany, Siegel, Zorn and Associates<br>1501 Lee Highway, Suite 205<br>Arlington, VA 22209 |



2012 MAY 30 AM 11: 36

2012 AUG -7 AM 9: 53

RECEIVED
GENERAL LAW DIVISION
OGC
HHS

1

Date Report of Investigation Submitted
to Agency:                                              May 28, 2012

Dates of Investigation:                          February 24, 2012-May 18, 2012

Method of Investigation:                        On-site

## III.   DESCRIPTION OF BASES AND ISSUES IN COMPLAINT

By letter dated February 8, 2012, the following was accepted for investigation:

Complainant alleges discrimination on the bases of age (47, ████████ 1964),
and a hostile work environment and retaliation for participating in the EEO
process when he complained to the union (the NTEU) and filed an EEO
complaint with the OEEO on October 31, 2011. The claims include:

1. On January 27, 2012, Dr. Fabricant notified Complainant that he selected
   Ms. Ramadevi Gudi for the Acting Team Leader detail that Complainant
   applied for. The Complainant has 11 years of FDA regulatory policy
   experience in dietary supplement work and Ms. Gudi has 18 months of FDA
   experience in the same area.

2. On January 27, 2012, Dr. Fabricant required Complainant to meet with him
   one-on-one without a witness in the room. The witness was a requirement of
   the FDA EAP Counselor.

3. On January 24, 2012, Dr. Fabricant intentionally sent an e-mail to the entire
   Dietary Supplement Regulations Implementation Team showing them an
   alleged mistake Complainant made on an export certificate package. Dr.
   Fabricant failed to contact Complainant prior to sending the e-mail containing
   the mistake to the team.

4. On September 1, 2011, Complainant's ability to obtain a work detail was
   obstructed because Dr. Daniel Fabricant refused to give his concurrence for
   any of the detail assignments that Complainant applied to.

5. From August 2011 to October 2011, Complainant's terms and conditions of
   employment and work assignment duties were altered to be inconsistent with
   his position description as a Chemist, grade 14. The duties were changed to
   those of a clerical employee, grade 9/11, including, receipt dating, assigning
   invoice numbers, entering requests into the database, preparing copies,
   printing, addressing envelopes and mailings.

6. From July 20, 2011 to October 31, 2011, Complainant was forced to alter his
   work hours and telecommuting schedule to accommodate meetings set by Dr.

2

Fabricant. On July 20, 2011, Dr. Fabricant scheduled a one-on-one PMAP meeting on Complainant's telecommuting day. Dr. Fabricant ignored Complainant's request to reschedule the meeting. On October 27, 2011, Dr. Fabricant scheduled the weekly team meeting for 9:00 AM which interfered with Complainant's 9:15 AM arrival time. On October 31, 2011 Dr. Fabricant scheduled the weekly recurring team meetings on Mondays, which is Complainant's regular telework day.

7. On March 14, 2011, Dr. Fabricant made derogatory comments to Complainant regarding his age such as, "You have a problem with age;" and, "Someone who has been around as long as you have should have ideas."

By letter dated March 30, 2012, the complaint was amended to include the following:

8. On February 27, 2012, Dr. Fabricant allowed Corey Hilmas to create a hostile work environment for Complainant when he allowed Dr. Hilmas to yell at Complainant during a team meeting, in front of Complainant's colleagues.

9. Between February 24 and 29, 2012, Dr. Fabricant assigned Complainant to data mine electronic files of documents, sort them electronically and email approximately 250 data files, which were assignments outside of Complainant's responsible duties.

## IV.   SUMMARY

**Complainant, Kenneth M. Taylor, PhD (age 47, DOB:** ▮▮▮▮**1964; prior EEO activity),** is currently employed as a Chemist, GS-14, Dietary Supplement Regulations Implementation Team (DSRIT), Division of Dietary Supplement Programs (DDSP), Office of Nutrition, Labeling and Dietary Supplements (ONLDS), Center for Food Safety and Applied Nutrition (CFSAN). He has served in this position for eleven (11) years. According to Complainant, his first, second and third level supervisors are, respectively: Daniel Fabricant, Director, DDSP; Barbara Schneeman, Director, ONLDS, and Michael Landa, Director, CFSAN.[1]  (ROI, Exhibit F2)

Prior to July 18, 2011, Robert Moore, Supervisor (Team Leader), DSRIT, who has since retired, was Complainant's first level supervisor.  (ROI, Exhibit F2)

Complainant states that he first engaged in protected activity on October 27, 2011, when he reminded Dr. Fabricant that the Collective Bargaining Agreement (CBA) provides that meetings cannot be scheduled outside of the established core hour. He asserts that his request of Dr. Fabricant to refrain from scheduling meetings during non-core hours and to adhere to the CBA is "protected activity." Complainant states that he also participated in protected activity when he initiated the instant EEO complaint on October 31, 2011.  (ROI, Exhibit F2)

---

[1] Mr. Landa states that he is Complainant's fourth level supervisor. (ROI, Exhibit F5)

Incident 1

Complainant alleges that a detail position – NDI Team Leader – was advertised via email from December 29, 2011 to January 9, 2012. Complainant applied, was not interviewed, and on January 27, 2012, learned that Dr. Ramadevi ("Rama") Gudi was selected. Complainant does not know what process was used in assessing candidate's skills and abilities, but he believes that a comparison of his qualifications with those of Dr. Rama would show that he is the superior candidate. Complainant states that he believes he was the only candidate who had performed "all related functions to the position." (ROI, Exhibit F2)

Complainant states that he does not believe that his age was a factor in Dr. Fabricant's selection decision. Rather, he believes that reprisal was the reason for his non-selection, e.g., for engaging in protected activity on October 27, 2011, October 31, 2011 and December 12, 2011 (amended complaint). Complainant states that Dr. Fabricant was well aware of his protected activity when he made his selection decision in January 2012. (ROI, Exhibit F2)

Incident 2

Complainant asserts that on January 24, 2012, Dr. Fabricant scheduled a meeting with him for January 27, 2012, to discuss distribution of certificates of free sale (CoFS) requests to DSRIT team members. Complainant responded to the request and copied Linda Webb, a coworker whom he wanted to serve as his witness during the meeting. When Dr. Fabricant questioned why Complainant wanted Ms. Webb to attend the meeting, the Complainant responded that he requested a witness to the meeting because of the advice of his EAP Counselor who recommended that he avoid one-on-one meetings with Dr. Fabricant. On January 27, 2012, when Complainant arrived at the meeting with Ms. Webb, Dr. Fabricant would not let her attend. Complainant alleges that Dr. Fabricant had a witness present during the meeting. Specifically, during the meeting, Dr. Hilmas sat at the secretary's station directly outside of Dr. Fabricant's office. Dr. Fabricant's office door remained open and both Complainant and Dr. Fabricant sat at a conference table, which was in earshot of the secretary's station. (ROI, Exhibit F2)

Complainant states that he believes Dr. Fabricant held the meeting without allowing him to have a witness present to further harass and intimidate him based on reprisal. (ROI, Exhibit F2)

Incident 3

Complainant alleges that, in reprisal for prior EEO activity, Dr. Fabricant circulated an email to the entire DRSIT team pointing out an error on an export certificate. Complainant had used Dr. Schneeman's name in the signature block rather than Dr. Fabricant's name. Complainant states that Dr. Fabricant used this situation as an opportunity to humiliate him in the presence of coworkers. He asserts that there was no

need for Dr. Fabricant to circulate an email to the entire Team; Dr. Fabricant could have spoken with Complainant about the error, or he could have sent an email to Complainant beforehand to at least give him an opportunity to address this concern. (ROI, Exhibit F2)

Incident 4

Complainant alleges that he initially sought Dr. Fabricant's supervisory concurrence for the following 3 detail positions:

1. Unclassified Duties, GS-15/15, vacancy announcement number CDER-11-150-OCTEC, Office of Counter Terrorism and Emergency Coordination at CDER

2. International Affairs Program Manager, GS-696-14 (Consumer Safety Officer), Office of Regulatory Affairs, Office of Regional Operations, Immediate Office

3. Deputy Director, equivalent to GS14/15, Office of Global Engagement, Office of International Programs

(ROI, Exhibit F2)

Complainant states that since each of the detail announcements specified that supervisory concurrence must accompany the application, on August 19, 2011, he sent emails to Dr. Fabricant requesting his concurrence to accompany each of the three applications. Dr. Fabricant responded by email on August 22, 2011, stating that he would like the opportunity to discuss the details with Complainant. In the meantime, he advised Complainant to prepare and submit his applications. Subsequently, on September 1, 2011, Dr. Fabricant informed Complainant that there was no requirement for him to submit his concurrence along with the application. (ROI, Exhibit F2)

Complainant states that on September 1, 2011, he emailed Dr. Fabricant to inform him of his interest in applying for a fourth detail:

4. Director, Forensic Chemistry Center, Central Region, Cincinnati, Ohio

Complainant states that when he sought Dr. Fabricant's concurrence for this detail position, he responded stating, "Just so we're clear, you do not need my concurrence to apply." According to Complainant, he submitted his application and indicated that, "... my supervisor is aware of my interest in this opportunity and supports my career endeavors, but believes that his concurrence is not necessary for me to apply." (ROI, Exhibit F2)

Complainant states that the question of whether he was actually selected is not relevant to "the claim [he] is making." He states that his claim is that Dr. Fabricant discriminated against him and placed him at a disadvantage because he could only submit incomplete applications that were inconsistent with the requirements in the detail announcements.

Complainant states, "I am not claiming that the selecting officials for the details mentioned directly above discriminated against me based on age and reprisal..." (ROI, Exhibit F2)

Incident 5

Complainant states that in August 2011, Dr. Fabricant assigned him the responsibility to serve as the point of contact (POC) for Certificates of Free Sale, duties which had been previously assigned to a full time GS 9/11 clerical/administrative employee. Complainant asserts that the tasks associated with serving as POC for CoFS are inconsistent with his position description. Many of the duties involve strictly clerical functions such as typing simple information into form letters, making copies, addressing envelopes, and mailing. (ROI, Exhibit F2)

Complainant states that Talisha Williams formerly performed the job vacated the position in 2010 and at that time, Dr. Moore, DSRIT Team Leader, took over performing the job.  Complainant states that since Dr. Moore knew it was contrary to the CBA and OMP requirements to assign those duties to a Chemist and other professional employees, Dr. Moore performed the duties until such time as he could fill the position. According to Complainant, Dr. Moore had mentioned that he typically would spend at least two or three days each week working on CoFS. (ROI, Exhibit F2)

Complainant states that DSRIT issues more certificates of free sale than any of the other programs at CFSAN.  Moreover, the office has always had a full-time employee devoted to performing those tasks. In 2009 and 2010, when Ms. Williams held that position, between 4,524 and 5, 097 certificates were issued. In 2011, greater than 6,000 certificates were issued. Based on current available data, comparable amounts are expected for 2012. (ROI, Exhibit F2)

Complainant asserts that, assuming it was acceptable to assign such duties to a professional staff employee, the duties should have been assigned to Dr. Corey Hilmas, Acting Team Leader of DSRIT.  Dr. Hilmas' position description provides, in relevant part, that he: "Manages and coordinates the review of regulations, Federal Register documents, guidance documents and policy statements involving dietary supplement compliance and enforcement, including Certificates of Free Sale and other Team activities." According to Complainant, Dr. Hilmas now occupies Robert Moore's former position and should be performing Dr. Moore's former duties.  (ROI, Exhibit F2)

Complainant states that since Dr. Fabricant became his supervisor, he has not performed work as a Chemist; rather, he has been relegated to primarily performing clerical/administrative duties. (ROI, Exhibit F2)

Complainant alleges that for the past several years, he has presented at the Association of Official Analytical Chemists (AOAC) Southern California Section (SCS) United States Pharmacopeia (USP) Conferences.  On June 14, 2011, he was again invited to be a presenter at the conference, which was scheduled for October 6-7, 2011.  Dr. Fabricant

6

designated Dr. Hilmas to present at the conference and never advised Complainant of his decision or reason for sending Dr. Hilmas rather than him. According to Complainant, Dr. Hilmas had only been with the office for 18 months and does not have as much experience as Complainant on speaking on regulatory requirements of dietary supplements. (ROI, Exhibit F2)

Complainant alleges that he no longer performs any work or duties described in his position description or duties that would be expected of a senior chemist and regulatory scientist. For example, Dr. Moore had assigned Complainant responsibility to respond to the Citizen's petition on the Regulatory Status of Pyridoxal-5 Prosphate (P-5-P). Complainant had begun some work on the assignment. However, around November 8, 2011, Complainant learned that Dr. Fabricant reassigned this project to Dr. Hilmas. (ROI, Exhibit F2)

Complainant states that during the last seven months, Dr. Hilmas has been involved with many tasks that are appropriate for Complainant's professional background, experience, and job description. FDA currently is working on responses to comments received on the draft dietary supplement liquids and new dietary ingredient guidance and Dr. Hilmas is involved with this. He also is a participant for a JIFSAN webinar. Dr. Hilmas regularly participates in meetings and projects related to topics that include economically motivated adulteration, mobile field lab assignments, the National Council of Prescription Drugs (NCPD) structured product labeling, and ephedrine alkaloid seizures, as well as assisting other agencies such as the Department of Justice and the Federal Trade Commission. (ROI, Exhibit F2)

Complainant believes that Dr. Fabricant discriminated against him in connection with job assignments based on reprisal and age. Dr. Hilmas is younger than Complainant and is around the same age as Dr. Fabricant. Complainant alleges that two coworkers, Linda Webb and Constance Hardy, who are in his age-group, are also not given assignments comparable to their position descriptions. (ROI, Exhibit F2)

Incident 6

Complainant states that since February 2003, he has worked a Maxiflex Schedule, with his official tour of duty being 10:00 a.m. to 6:30 p.m. From 2004 until late October 2011, Complainant had a Flexible Workplace Agreement (telework) that permitted him to work at home on Mondays and Wednesdays. He worked in the office on Tuesdays, Thursdays and Fridays. As a result of Dr. Fabricant's scheduling of meetings, Complainant has been required to: (a) on two occasions, report to work prior to his official tour of duty and, (b) permanently alter his telework days. (ROI, Exhibit F2)

According to Complainant, Dr. Fabricant scheduled a meeting with him for Monday, July 25, 2011 (Complainant's telework day), to discuss Complainant's mid-year Performance Management Appraisal Plan (PMAP). Complainant agreed to meet with Dr. Fabricant, as requested, and was allowed to use a substitute telework day. (ROI, Exhibit F2)

7

Complainant alleges that on October 21, 2011, Dr. Fabricant scheduled an 8:00 a.m. meeting, and on October 27, 2011, a meeting was scheduled for 9:00 a.m.; both meetings were scheduled outside the Agency's core hours and both meetings conflicted with Complainant's Maxiflex Schedule tour of duty.  Complainant states that during the October 27th meeting, he informed Dr. Fabricant that he was scheduling meetings outside of the Agency's core hours, which is contrary to the provisions of the CBA. Complainant alleges that Dr. Fabricant then retaliated against him for bringing this matter up, i.e., Dr. Fabricant began scheduling recurring Monday DSRIT meetings, which caused Complainant to alter his telework schedule from working at home on Mondays and Wednesdays to working at home on Tuesdays and Thursdays.  (ROI, Exhibit F2)

Complainant states that he does not believe that any other DSRIT member's schedule was affected by Dr. Fabricant's scheduling of team meetings.  Complainant believes that his age is "partially a factor" because Dr. Fabricant had previously made age-related comments to him that went beyond the scope of appropriate conversation for the workplace (incident 7).  Complainant also believes that Dr. Fabricant was motivated by reprisal because he told him that he was violating the CBA.  Complainant asserts that, as further evidence that Dr. Fabricant wanted to inconvenience and harass him, he could have approved Complainant's request to participate in the meetings via teleconference, but he did not.  (ROI, Exhibit F2)

Incident 7

Complainant states that on March 14, 2011, he had an introductory meeting with Dr. Fabricant.  During the meeting, he and Dr. Fabricant asked each other questions about their respective backgrounds.  Complainant alleges that, for no apparent reason, Dr. Fabricant said, "You have a problem with age."  Complainant states that he believed that Dr. Fabricant's statement was inappropriate and unprofessional, but he did not respond.  (ROI, Exhibit F2)

Also, during that meeting, Dr. Fabricant asked Complainant about ideas for a strategic plan for the office. Complainant states that he explained to Dr. Fabricant that he considers himself a "nuts and bolts" person and that strategic plans often detract from completing more pressing items. Dr. Fabricant kept insisting that Complainant provide ideas for a strategic plan, and when Complainant could not offer any, Dr. Fabricant said, "Someone who has been around as long as you should have ideas." (ROI, Exhibit F2)

Incident 8

Complainant alleges that in a February 27, 2012 staff meeting attended by Complainant, Dr. Fabricant, Dr. Hilmas and Ms. Hardy, they discussed which products are appropriate for DSRIT to review and issue export certificates.  Complainant states that there was a disagreement; Drs. Hilmas and Fabricant had a different view than Complainant did.  As the discussion progressed and Complainant questioned the basis

of their view, Complainant states that Dr. Hilmas continually raised his voice (at least three times). Dr. Fabricant did not intervene to stop Dr. Hilmas from yelling. (ROI, Exhibit F2)

Incident 9

Complainant states that between February 24 and 29, 2012, he was assigned additional clerical/administrative duties. Specifically, Complainant was asked to perform a database search for electronic files of certificate of free sale letters. He states that the assignment is a continuation of Dr. Fabricant's efforts to discriminatorily minimize his job as a Chemist. He also believes that Dr. Fabricant is trying to set him up for failure since Dr. Fabricant knew that Complainant was having difficulty performing the task. (ROI, Exhibit F2)

Complainant states that he reported Dr. Fabricant's harassment to Dr. Barbara Schneeman, Director, ONLDS, on or about October 28, 2011; and to Michael Landa, Director, CFSAN, on January 20, 2012. No action was taken by either manager. According to Complainant, Dr. Schneeman responded that she could not get involved in the matter, that it was not good management for her to do so, and that Dr. Fabricant and Complainant would need to resolve things. Mr. Landa responded by email on January 26, 2012, stating that, since Complainant had filed a formal complaint about the matter, he would "remain separate and apart from this process to allow an objective and fair review of [Complainant's] concerns." (ROI, Exhibit F2)

**Daniel S. Fabricant (age 36, DOB:** ▇▇**1975, no prior EEO activity), Director, DDSP, ONLDS, CFSAN,** has served in his current position for a little over one year. His first and second level supervisors are, respectively, Dr. Schneeman and Mr. Landa. Dr. Fabricant has served as Complainant first level supervisor since July 2011. Prior to July 2011, Dr. Moore, Team Leader, DSRIT, was Complainant's first level supervisor. Dr. Fabricant was Complainant's second level supervisor. (ROI, Exhibit F3)

Dr. Fabricant states that he first became aware of Complainant's EEO complaint in the instant case in November 2011. He was interviewed by the EEO Counselor on November 17, 2011. Regarding Complainant's assertion that he engaged in EEO activity when he alleged a CBA violation regarding scheduling meetings during non-core hours, Dr. Fabricant states that he did not consider Complainant's statement anything more than just an employee expressing dissatisfaction with what was proposed. (ROI, Exhibit F3)

Incident 1

Dr. Fabricant states that he was the selecting official for the NDI Team Leader detail position; no other agency official was involved. (ROI, Exhibit F3)

Dr. Fabricant states that he reviewed applications, including the one submitted by Complainant, and assessed applicant's qualifications against his matrix, which included:

(a) demonstrated leadership skills; (b) the ability to work as part of a team, (c) similar pre-market-type regulatory knowledge and experienced (experience in new dietary ingredient), (d) experience/expertise in toxicology and (e) their scientific relevance. (ROI, Exhibit F3)

Dr. Fabricant states that he selected Dr. Gudi for the position because, when measured against his matrix, she was the superior candidate. Specifically, he states that Dr. Gudi has approximately 16 years of director/management experience outside of the agency managing a diverse group. Dr. Gudi's outside experience is directly related to the work that is performed by the NDI team. Because of the nature of the work performed in NDI, the team has historically been managed by a toxicologist. Dr. Gudi has world-wide recognition as a first class toxicologist. Furthermore, Dr. Gudi has worked for the NDI team for almost two years and had often acted as Team Leader in the absence of the former Team Leader. (ROI, Exhibit F3)

Dr. Fabricant contends that Complainant was not the best candidate for the following reasons: While Complainant has expertise in chemistry and regulatory experience, he is not a toxicologist by training or experience. Complainant has not demonstrated that he works well as a team member. He is often disruptive and expresses unhappiness about his job, e.g., he tells employees in the office that he is going to "get" Dr. Fabricant; he has lashed out at a secretary; he constantly broods; and he was reluctant to comply with Dr. Fabricant's request for access to his electronic calendar. Dr. Fabricant maintains that when Complainant had his introductory one-on-one, he was non-responsive to Dr. Fabricant's requests for ideas about improvements in the operation of the office. Rather, Complainant commented that it was not his responsibility to set the vision for the Director. Complainant also commented that he believes that the "Deputy and Director positions should be fired." Dr. Fabricant asserts that emails have been received from firms complaining that Complainant is non-responsive to their requests.[2] Complainant was struggling with his assigned duties. There was no reason to believe that he would be able to successfully serve as Team Leader for the NDI team. (ROI, Exhibit F3)

Incident 2

Dr. Fabricant states that he scheduled the January 27, 2012 meeting with Complainant to discuss distribution of CoFS to staff members. It appeared that assignments were not being made in an equitable manner. Complainant requested to have Linda Webb attend the meeting as a third party witness, which Dr. Fabricant denied because Ms. Webb did not have recognition by Human Resources or the Union to serve as a third party in meetings between managers and supervisors. Dr. Fabricant states that, notwithstanding his right as a manager, in accordance with the CBA, to meet with employees one-on-one to discuss work issues, he attempted to accommodate Complainant's wishes. Specifically, he informed Complainant that they could look into getting a mediator, or someone who was sanctioned to serve as a third party, to attend

---

[2] Dr. Fabricant submitted examples of customer complaints. (ROI, Exhibit F26)

the meeting with him.  However, Complainant rejected his alternative solution. (ROI, Exhibit F3)

Dr. Fabricant states that he cannot specifically recall whether any other employee has requested the presence of a witness during one-on-one meetings; however, if any employee requested the presence of a third party, it would have been a party sanctioned by Employee Relations or the Union to serve as a third party.  (ROI, Exhibit F3)

Dr. Fabricant states that contrary to Complainant's assertion, he did not have a witness present during the meeting, nor did he request that Dr. Hilmas sit outside of his office. He states that if Dr. Hilmas was outside of his office, he was probably reviewing the stacks of "comments" which were stored outside of his doorway.  (ROI, Exhibit F3)

Incident 3

Dr. Fabricant testifies that he sent the January 24, 2012 email to all DSRIT members reiterating and re-enforcing his previous November 8, 2011 instructions to use the appropriate templates with the appropriate signature block on certificates.  He states that he also attached the correct template as well as the one that was processed with the incorrect signature block.  Dr. Fabricant maintains that there was no intent to publically embarrass Complainant.  He states that he believed that the entire team would benefit from his re-statement of this point.  He states that he wanted an immediate end to the practice of sending out correspondence with the incorrect signature block.  (ROI, Exhibit F3)

Dr. Fabricant states that he has also forwarded a similar email to another employee, Linda Webb.  On another occasion, during a team meeting, he discussed a problem with an employee who had sent out a warning letter to a firm, without going through the proper channels.  Dr. Fabricant states that his intention is never to embarrass, harass or otherwise discriminate against any employee.  (ROI, Exhibit F3)

Incident 4

Dr. Fabricant states that he did not deny Complainant's request for supervisory concurrence.  He states that he explained to Complainant that he did not believe supervisory concurrence was required in order for him to apply for a detail since it was not a CFSAN standard policy.  Also, it was not a requirement for the NDI Team Leader detail which Dr. Fabricant had advertised.  Even though he did not believe his supervisory concurrence was required, Dr. Fabricant states that he did in fact give Complainant concurrence on earlier requests.  Regarding three of the detail announcements, Dr. Fabricant states that, via email, he instructed Complainant to "go ahead and submit his applications" and wished him luck.  Dr. Fabricant states that if the announcements in question required supervisory concurrence, he would not have known since Complainant did not share a copy of the actual announcement with him nor did Complainant correct him when he (Dr. Fabricant) said that supervisory concurrence

11

was not required.  Dr. Fabricant states that if Complainant had wanted something different than his verbal and written encouragement, he should has asked for more, or should have shown Dr. Fabricant a copy of the detail announcements referencing the requirements for application. (ROI, Exhibit F3)

Incident 5

Dr. Fabricant states that he assigned Complainant to serve as the coordinator for the CoFS project. He also assigned other DSRIT members, including Complainant, the additional duties of processing CoFS. He states that Dr. Moore, the previous Team Leader, had performed the function of coordinating and processing CoFS. However, when Dr. Moore retired and there was no additional FTEs, it became necessary for him to assign the duties to other staff members. (ROI, Exhibit F3)

Dr. Fabricant states that Complainant's duties may contain some clerical components, but the duties are not strictly clerical. As coordinator of the CoFS project, Complainant is responsible for tracking CoFS and assigning them to other DSRIT staff members for processing.  Complainant is also responsible for processing CoFS.  (ROI, Exhibit F3)

Dr. Fabricant states that he does not believe that Complainant's work connected with CoFS constitute a full time job. He states that Dr. Moore, the former Team Leader, DSRIT, performed these duties for approximately three years and was able to do so within six hours per week.  (ROI, Exhibit F3)

Dr. Fabricant testifies that he designated Dr. Hilmas to present at the AOAC conference because the conference organizer, Dr. Sumit Sen, informed him that he was interested in having someone from the division to speak about the new NDI draft guidance. He states that he and Dr. Sen originally discussed the possibility of Dr. Fabricant presenting, but that was not conducive to Dr. Fabricant's schedule.  Dr. Fabricant determined that Dr. Hilmas was the next best person because he was "intimately involved in writing the new NDI draft guidance" and could speak on labeling. Dr. Fabricant stated that Complainant had no role in writing the NDI draft guidance. (ROI, Exhibit F3)

Dr. Fabricant denies Complainant's allegation that Dr. Hilmas has been assigned a project which was originally assigned to Complainant – responding to the Citizen's petition on the regulatory status of P-5-P. He states that Complainant did all of the work in connection with that task. However, he assigned Dr. Hilmas to shepherd the comments through the approval process.  Dr. Hilmas works well with the office that has responsibility for approving the comments.  This is a role which would have been performed by Dr. Moore as Team Leader.  Dr. Hilmas is currently fulfilling that role in a detail position.  (ROI, Exhibit F3)

Regarding Complainant's assertion that Dr. Hilmas is given all of the significant work in the office, Dr. Fabricant states that Dr. Hilmas is serving in the role formerly held by Dr. Moore and is therefore performing duties that were previously performed by Dr. Moore.

Dr. Fabricant notes that Complainant did not perform "these sorts of activities (enforcement/compliance)" when he was under Dr. Moore's supervision. He states that Complainant is struggling with CoFS, appears overwhelmed by those duties to the point where he sought EAP counseling, and has indicated in DSRIT meetings that he is not interested in policy or enforcement type activities or discussion when these topics are brought up. He states that Complainant has not approached him with an interest in additional duties. (ROI, Exhibit F3)

Incident 6

Dr. Fabricant testifies that when he scheduled a PMAP meeting with Complainant for 9 a.m. on July 25, 2011, it did not occur to him that the date was a telework day for Complainant. He nevertheless held the meeting on that date because it was the date most convenient for him; his decision to hold a meeting on Complainant's telework day is consistent with the CBA. The meeting was originally scheduled for 9 a.m., but was changed to 10 a.m. to accommodate Complainant. Dr. Fabricant states that he did not intend to inconvenience Complainant and allowed him to choose another telework day. (ROI, Exhibit F3)

Dr. Fabricant states that meetings were originally scheduled for October 21, 2011 at 8 a.m. and October 27, 2011 at 9 a.m. However, to accommodate Complainant, the meetings did not take place at those times. He states that he denied Complainant's request to attend the meetings via teleconference because he strongly felt that he wanted to bring staff together in an effort to promote team work, which did not seem to be the case prior to his arrival. He was interested in having all staff present in the office during the very first staff meeting so as "to get things up and running." (ROI, Exhibit F3)

Dr. Fabricant states that he does not believe that any other employees' schedules were altered as a result of the recurring Monday staff meeting. However, Monday was the most convenient date for his schedule, and it seemed to have a lesser overall impact on the entire team. Complainant chose a different telework day and has not indicated to him that the change is a problem. (ROI, Exhibit F3)

Incident 7

Dr. Fabricant states that he had an introductory one-on-one meeting with Complainant on March 14, 2011. During that meeting, Complainant asked numerous questions that seemed to center around a timeline that defined Dr. Fabricant's age. Dr. Fabricant states that he stated to Complainant, "You seemed obsessed with my age, my age is very important to you." He maintains that this was not a derogatory statement; rather it was an observation of Complainant's conversation with him. (ROI, Exhibit F3)

Dr. Fabricant stated that he did not say to Complainant that, "Someone who has been around as long as you should have ideas." He states that when Complainant failed to respond to his request for ideas about ways to better accomplish the mission of the office, and whether he had any ideas about standard operating procedures, he told

Complainant that "someone who has been with the Division for about 10 years, which is a good amount of time, probably has and should have ideas about ways to improve the organization." He states that his comment had nothing to do with age; he was referring to Complainant's background with the organization. (ROI, Exhibit F3)

Incident 8

Dr. Fabricant states that during the February 27, 2012 meeting, staff was discussing policy and compliance issues. Dr. Hilmas and Dr. Taylor were disagreeing on a point related to what products the office should review. The two were expressing different opinions and the discussion went back and forth. Dr. Hilmas has a loud voice, but was not yelling at Complainant. The Complainant repeatedly asked Dr. Hilmas not to yell at him and Dr. Hilmas repeatedly responded, "I am not yelling." Dr. Fabricant states that he did not consider the exchange to be anything more than two employees who were expressing different opinions on a work-related matter. He states that he does not believe that there was any hostility or any intent to subject Complainant to a hostile work environment. Complainant did not complain to Dr. Fabricant that he believed that he was subjected to a hostile work environment. (ROI, Exhibit F3)

Incident 9

Dr. Fabricant contends that Complainant was assigned a simple task of searching for hybrid letters for an electronic interface for CoFS; this involved using the search function on Microsoft. The duties were within the purview of Complainant's responsibilities because they related to CoFS. He asserts that Complainant failed to accomplish the task on time and Dr. Hilmas performed the task in 20 minutes so that the deadline would be met. (ROI, Exhibit F3)

Dr. Fabricant denied that he discriminated against Complainant based on age, reprisal or another other reason. He stated that he is not aware of "any alleged harassment problems being brought to the attention of higher management." (ROI, Exhibit F3)

**Robert Moore (age 55, DOB: ▊1957; no previous EEO activity), PhD, former Team Leader, DSRIT,** testifies that he retired in November 2011. Prior to his retirement, he supervised Complainant for approximately 9 years.   (ROI, Exhibit F6)

Dr. Moore testifies that Dan Levy, who previously held the position as NDI Team Leader, had a chemical and microbiology (toxicology) background. He states that most of the members of the staff in the NDI group are microbiologists and toxicology-types. Since the primary purpose of the NDI team is to review safety data and make risk assessments, having individuals on the NDI team who specialize in toxicology makes sense. (ROI, Exhibit F6)

Dr. Moore states that during the time that Complainant worked under his supervision, Complainant did not perform duties equivalent to those performed by the NDI Team Leader. Dr. Moore states that, to his knowledge, as a member of DSRIT, Complainant

14

participated in the NDI review process only in a capacity, as needed, of post-notification review of the marketplace to determine if a substance that was the subject of a notification was being marketed. As to any other tasks that may have been requested of him in conjunction with his participation in the NDI Team's as a DSRIT representative, Dr. Moore states that he would have no knowledge of them since those activities did not require his approval or review. (ROI, Exhibit F6)

Dr. Moore stated that he took over responsibilities for processing CoFS around June 2006, when the CoFS project coordinator left FDA. He performed those duties for approximately two years. A new employee was hired to fill that position, but left in approximately late 2009 - early 2010. At that time, Dr. Moore states that he resumed the task of completing CoFS requests until just shortly before he left FDA. He states that he performed the CoFS duties since there was no Agency authorization to backfill the position. He states that he probably spent about 25 percent of his time, at the most, performing duties in connection with CoFS. Dr. Moore testified that while the work is very simple, he noticed that Complainant and other staff members appeared to be making it more complicated than need be. (ROI, Exhibit F6)

In anticipation of his retirement, Dr. Moore stated that he and Dr. Fabricant discussed what to do with the CoFS program. Dr. Moore recommended that the project coordinator responsibilities be assigned to Complainant. When Dr. Fabricant held a meeting with the DSRIT staff concerning the added responsibility for CoFS, Dr. Moore believes that it was clear that staff were unhappy and felt that the job was beneath them. Dr. Moore states that both he and Dr. Fabricant informed the staff that he (Dr. Moore) had been doing the job for years. Moreover, it is a job that must be done and there was no choice but for them to perform those duties until management is able to backfill the position. (ROI, Exhibit F6)

Dr. Moore states that he does not believe that Dr. Hilmas receives preferential treatment based on any discriminatory reason. He states that Dr. Hilmas had worked closely with him in preparation of his retirement. At Dr. Moore's recommendation, Dr. Fabricant and Dr. Moore had planned that Dr. Hilmas would temporarily take over Dr. Moore's individual assignments and tasks when he retired. Dr. Moore states that Dr. Hilmas "shadowed" him for a period prior to his retirement and was his "right-hand man." Dr. Moore believes that Dr. Hilmas was the best qualified to take over and he inherited most of Dr. Moore's unfinished business. (ROI, Exhibit F6)

Dr. Moore states that he has not witnessed anything that would make him believe that Dr. Fabricant discriminated against Complainant in any way. (ROI, Exhibit F6)

**Barbara O. Schneeman, PhD (age 64, Month/Year of birth: ▮1948; prior EEO activity), Director, ONLDS, CFSAN**, states that she is Complainant's second level supervisor. (ROI, Exhibit F4)

Dr. Schneeman states that the only issue Complainant brought to her attention was when he complained that he was being required to attend a meeting in the office on his

telework day.  She states that Complainant was quite upset about this matter and regarded Dr. Fabricant's request as harassment.  She states that she does not believe that Complainant attributed the alleged harassment to his age or reprisal.  (ROI, Exhibit F4)

Dr. Schneeman asserts that she spoke with Dr. Fabricant regarding Complainant's concerns and explained to Dr. Fabricant three options, i.e., (1) Complainant could participate in the staff meeting via teleconference call; (2) Dr. Fabricant could reschedule the meeting; (3) or Complainant could switch his telework day.  She states that she believed the issue had been resolved.  (ROI, Exhibit F4)

Dr. Schneeman states that Complainant did not bring to her attention that he believes he was discriminated against when he was not selected for the detail position of NDI Team Leader.  She was informed by Dr. Fabricant that the person selected has excellent management skills and familiarity with NDI.  (ROI, Exhibit F4)

Dr. Schneeman states that Complainant did not inform her that he believed that Dr. Fabricant was obstructing his opportunities to obtain details.  She states that she is not aware of any policy that requires concurrence to apply for a detail; however, she believes that if an employee is selected, then he/she will then obtain the supervisory concurrence.  Generally, this is how it is done in ONLDS.  (ROI, Exhibit F4)

Dr. Schneeman states that Complainant did not inform her of his objections to his responsibilities for CoFS.  She states that she is aware that he was not enthusiastic about the assignment.  Dr. Schneeman states that processing CoFS constitutes important work, which must be accomplished.  Clients pay fees for this service and the Agency needs to ensure the integrity of the program.  She states that while processing CoFS may not be the most exciting activity, it is not a trivial activity.  (ROI, Exhibit F4)

**Michael M. Landa (age 62, DOB:** ▇▇▇1949; prior EEO activity), Director, CFSAN, testifies that he is Complainant's fourth level supervisor.  He states that Complainant met with him on January 20, 2012, and expressed concerns he had regarding Dr. Fabricant.  He states that on the same day, Complainant sent him an email memorializing the meeting.  Complainant generally complained that Dr. Fabricant had assigned him work (CoFS) that is not commensurate with his position, grade, background and experience.  Complainant indicated that Dr. Schneeman would not become involved in the matter and he appealed to Mr. Landa to resolve his concerns.  Complainant also presented Mr. Landa with a copy of his formal EEO complaint.  (ROI, Exhibit F5)

Mr. Landa states that he responded to Complainant assuring him that he (Mr. Landa) does not tolerate any form of discrimination and that complaints of discrimination are taken very seriously.  He informed Complainant that he had taken the appropriate steps by reporting his concerns to the Agency's Office of Equal Employment Opportunity and engaging the complaint process.  He states that since the formal complaint has been

lodged, it is important that he remains separate and apart from the process to allow an objective and fair review of Complainant's concerns.  (ROI, Exhibit F5)

**Corey J. Hilmas, MD/PhD (age 39, DOB: ▇▇▇1973, no prior EEO activity), Acting Team Leader, DSRIT**, states that he is Complainant's Team Leader, but he does not have supervisory authority over Complainant.  (ROI, Exhibit F7)

Dr. Hilmas states that he does not have direct information regarding the selection process for the NDI Team Leader position. However, he is aware that the selectee, Dr. Gudi, is approximately 58 years old.  He states that he and Dr. Gudi worked together in NDI and therefore, he is aware of her experience, knowledge and background.  Dr. Gudi previously worked for a bio-tech firm and has many years of experience in work that involves managing a staff of employees and running multi-million dollar GLP toxicology studies.  He states that he and Dr. Gudi were the primary FDA employees who were responsible for drafting regulatory guidance for new NDI Draft Guidance for Industry, and evaluating comments from the public and industry.  Dr. Hilmas states that the previously Team Leader in NDI, Dan Levy, is a microbiologist and gene toxicologist with additional experience in general toxicology.  (ROI, Exhibit F7)

Dr. Hilmas states that he is familiar with the January 24, 2012 email from Dr. Fabricant to members of DSRIT, in which an error was pointed out regarding the preparation of a CoFS.  He states that Dr. Fabricant did not "call anyone out" in the email by name.  Dr. Hilmas does not recall any specific instance where Dr. Fabricant has "called out" anyone for making an error. (ROI, Exhibit F7)

Dr. Hilmas contends that processing CoFS is a compliance task.  He states that when he worked directly with Dr. Moore, he processed both 30-day Structure Function Notices and requests for CoFS, from June to October 2011, a task which he alone performed.  He states that Complainant assigned him the lion's share of CoFS to process during the first quarter of the fiscal year, and that Complainant assigned the bulk of the review work to Dr. Gudi during the second quarter of the fiscal year.  (ROI, Exhibit F7)

Regarding Complainant's claim that Dr. Hilmas gets all of the substantive assignments, Dr. Hilmas states that Complainant also receives substantive assignments such as serving as Project Manager for Certificates of Free Sale and writing the P-5-P citizen petition.  Dr. Hilmas contends that work related to CoFS is substantive and involves the application of FDA statute to perform an in-depth label review for misbranding charges, violations of 801(e) of their statute, investigation of disease claims made on labels, and generating an untitled letter to the responsible firm of FDA findings.  He states that Complainant worked on a major petition last year.  (ROI, Exhibit F7)

Dr. Hilmas states that Dr. Fabricant designated him to speak at the AOAC conference because the conference organizer wanted someone to speak on the recently released NDI Draft Guidance for Industry, which he and Dr. Gudi worked on.  Dr. Gudi was not available to present, so Dr. Fabricant designated Dr. Hilmas.  (ROI, Exhibit F7)

Dr. Hilmas maintains that he was not assigned to work on the P-5-P project which Complainant completed. Rather, he was tasked with the job of walking the petition through the CFSAN approval process. (ROI, Exhibit F7)

Dr. Hilmas denies that he yelled at Complainant during the February 27, 2012 meeting. He states that he brought up the fact that they need to evaluate requests for CoFS in accordance with 801(e) of the statute as the export certificate SOPs at the Agency describe." (ROI, Exhibit F7)

**Constance Hardy (age 60, DOB:█████1951; no prior EEO activity), GS- 14, Interdisciplinary Scientist, Dietician, DSRIT, DDSP, ONLDS, CFSAN,** states that she and Complainant are co-workers. (ROI, Exhibit 8)

Ms. Hardy testifies that she while she does not know whether discrimination was a factor, she is not surprised that Dr. Gudi was selected for the NDI Team Leader detail position. She states Dr. Fabricant seems to favor Dr. Gudi and Dr. Hilmas, who are relatively new to the office. They often communicate privately with each other and have lunch together. (ROI, Exhibit 8)

Ms. Hardy states that she believes that Complainant's duties connected with CoFS constitute a full time job. She states that she is never "caught up" and she does not have to do the amount of recordkeeping that Complainant must do. She also notes that the number of denial letters for CoFS has significantly increased since Complainant assumed the role as coordinator. Denial letters take more time to complete. (ROI, Exhibit 8)

Ms. Hardy believes that Dr. Hilmas receives the more substantive assignments. She states that when Dr. Moore was Team Leader, he shared more of the substantive assignments with members of the team. Since Dr. Fabricant has come on board, Dr. Hilmas receives the more substantive assignments. While she does not know what the substantive assignments are, Ms. Hardy states that they are told that Dr. Hilmas is too busy working "on other things" so he should not be given any CoFS or Structure Function notifications. She states that she has not been given "anything of a substantial enforcement nature to work on." (ROI, Exhibit 8)

Ms. Hardy was present during the February 27, 2012 meeting and testifies that she noticed that, during a discussion of CoFS, Dr. Hilmas yelled at Complainant. She states that Dr. Hilmas seemed to be implying that Complainant had done something wrong. Dr. Fabricant never asked Dr. Hilmas to stop yelling. She states that she felt badly for Complainant. (ROI, Exhibit 8)

Ms. Hardy states that she initially thought that Dr. Fabricant discriminated against women based on gender because he seemed to initially target women. For example, Angela Pope and Barbara Prigmore seemed to have had issues with Dr. Fabricant. She also considered that it might have been based on race because Ms. Pope and Ms.

18

Prigmore are African Americans.  However, now that Dr. Fabricant has targeted two males, Complainant and another male employee, in his mistreatment, she states that it is difficult to attribute his action to gender, race or age.  He seems to bully and intimidate mostly everyone.  She also has been a victim of his bullying and intimidation. (ROI, Exhibit 8)

**Linda J. Webb (age 58, DOB: ▇1954; prior EEO complaint), GS- 13, Consumer Safety Officer, DSRIT, DDSP, ONLDS, CFSAN**, testifies that she and Complainant are co-workers.  (ROI, Exhibit 9)

Ms. Webb states that she does not know whether the selection of Dr. Gudi was based on discrimination.  She believes that Dr. Fabricant does not like Complainant and is trying to get him to leave.  Mr. Levy, who previously held the NDI Team Leader position, is currently on detail to another organization.  Ms. Webb also asserts that when Mr. Levy was with DSRIT, he was ignored by Dr. Fabricant.  Mr. Levy does not plan to return to his position when his detail is over.  Ms. Webb states that she does not know whether discrimination was a factor in Dr. Fabricant's treatment of Mr. Levy, who she identifies as gay.  She states that the selectee, Dr. Gudi and Dr. Fabricant "seemed to have developed some sort of relationship." (ROI, Exhibit 9)

Ms. Webb states that, in terms of how much time it takes to process CoFS, Dr. Moore was not following proper procedures when he performed the job alone.  She states that it takes most of her time to perform the job properly (process CoFS).  In addition to processing CoFS, Complainant has been assigned to also serve as the point of contact.  Therefore he has considerably more responsibilities than those who only have to process CoFS. (ROI, Exhibit 9)

Ms. Webb testifies that Dr. Hilmas receives the more substantive assignments.  She states that, as with Dr. Gudi, Dr. Fabricant has developed a special relationship with Dr. Hilmas; they meet often.  Work that other team members could perform is performed by Dr. Hilmas, e.g., working closely with the Offices of Compliance and Enforcement on warning letters.  It is only after the investigation of Complainant's EEO complaint that she is being assigned work more in line with what she should be performing. (ROI, Exhibit 9)

Ms. Webb testifies that Dr. Fabricant did not permit her to attend the January 27, 2012 meeting with Complainant.  When she showed up with Complainant, Dr. Fabricant informed her that she was not welcome.  As she was leaving the meeting, she states that she heard Dr. Fabricant ask Complainant if it was fine with him if the door was left open.  At that time, Dr. Hilmas was outside of the office, hunched over, as if he was trying to hide.  He was not reading files or performing any work. (ROI, Exhibit 9)

Regarding the Complainant being required to attend staff meetings on his telework day, Ms. Webb states that she does not necessarily have reason to believe that discrimination was at issue, but it appeared as if Complainant was being singled out. Complainant was required to come in on his day to work at home.  The union contract

provides that an employee can participate in meetings by teleconference. There was no need for Complainant to be required to come into the office. (ROI, Exhibit 9)

Ms. Webb states that while she had not heard Dr. Fabricant make inappropriate age-related comments, she believes that employees, who are a bit older, are treated less favorably. Ms. Webb believes that Dr. Fabricant's actions have negatively impacted Complainant and the more senior employees in DRSIT. She states that almost all of the higher level work that the more senior employees once performed is now being performed by Dr. Hilmas (one of the most junior employees) in DSRIT and the Complainant has been relegated to performing clerical duties. (ROI, Exhibit 9)

Ms. Webb testifies that Dr. Fabricant has been on board for a little over a year, but the hostile work environment only began a few months ago, when he began engaging in unprofessional conduct and creating a hostile work environment. Ms. Webb states that because of the way Dr. Fabricant comports himself and interacts with others – raising his voice, becoming aggressive and shouting people down – people began to complain to Dr. Schneeman about him. However, Ms. Webb believes that Dr. Schneeman has taken no corrective actions and instead, reports back to Dr. Fabricant who said what. Ms. Webb believes that Dr. Schneeman is not fulfilling her role as a supervisor to protect subordinate employees from the hostile work environment. (ROI, Exhibit 9)

Ms. Webb states that because of Dr. Fabricant's treatment of employees, several employees who have obtained details to other offices do not plan to return to work under his supervision. While Ms. Webb states that she is not aware of the specific details, she believes other employees in the division are also experiencing problems with Dr. Fabricant. Shirley Blakely, a Black female (over 40) probably would like to file an EEO complaint, according to Ms. Webb; additionally, a number of employees have taken their complaints to Steve Bradbar, Management-Program Analyst, 360 Program, regarding Dr. Fabricant's mistreatment of employees. The 360 Program is set up to assist managers in becoming better managers by, once learning of employees' issues, the program sets up training and mentoring opportunities to assist the manager in becoming more effective supervisors. (ROI, Exhibit 9)

**Angela Pope (age 49, DOB: ▮1962), GS-13, Consumer Safety Officer, Good Manufacturing Practices, DDSP, ONLDS, CFSAN, FDA,** states that her first level supervisor is Dr. Fabricant. She is not in Complainant's chain of Command. Prior to July 2010, she worked directly with Complainant in DSRIT. (ROI, Exhibit 10)

Ms. Pope states that processing CoFS is clerical work and that type of work is not on the same career track as the scientific disciplines. She states that she does not believe that the office is making good use of Complainant's skills and talents by assigning him CoFS to process. She states that while she is not sure, the bulk of Complainant's duties seems to now involve processing CoFS. There is plenty of other work to be performed in DSRIT, e.g., "dietary supplement label reviews and policy-type work." (ROI, Exhibit 10)

Ms. Pope states that she does not have reason to believe that Dr. Fabricant discriminated against any employee because of age. (ROI, Exhibit 10)

**Brian Somers (age 65, DOB: ▆▆1947), Special Assistant to the Director, ONLDS, CFSAN, FDA,** states that his first level supervisor is Dr. Schneeman; he is not in Complainant's chain of command. (ROI, Exhibit 11)

Mr. Somers states he does not believe that there is a requirement to have supervisory concurrence in order to apply for a detail opportunity. He states that the CBA gives managers to right to meet with employees without the presence of a witness to discuss matters related to work and assignments. (ROI, Exhibit 11)

Mr. Somers states that he has no reason to believe that Dr. Fabricant is motivated to publically embarrass Complainant or otherwise discriminate against him based on age or reprisal. (ROI, Exhibit 11)

**Joann M. Givens (age 53, DOB: ▆▆1958; prior EEO complaint activity), Deputy Regional Food and Drug Director, Central Region, FDA,** testifies that she and her first level supervisor, Melinda K. Plaisier, Regional Food and Drug Director, Central Region, made selection decisions for the detail position of Director, Forensic Chemistry Center, Cincinnati, Ohio. The announcement was for multiple details, on a rotating basis. (ROI, Exhibit 13)

Ms. Givens states that she does not know the Complainant, his age or whether he has prior EEO activity. (ROI, Exhibit 13)

Ms. Givens states that Tina Powell, Program Analyst, FDA Central Region, received the applications and forwarded them to her and Ms. Plaisier for review and selection consideration. Ms. Plaisier and Ms. Givins made the selections and scheduled the rotations for the three successful candidates. Complainant's application package was considered along with other applications that were received. (ROI, Exhibit 13)

Ms. Givins states that they considered the fact that the work performed in the Forensic Chemistry Center, Office of Regulatory Operations (ORA) Cincinnati, Ohio, is very specialized. Therefore, they considered whether the candidates had knowledge of the Forensic Chemistry Center and its operation, and whether the candidate had knowledge of ORA field operations. Three selections were made. Each of the selectees met the selection criteria, two had internal Forensic Chemistry Center experience/background and one had ORA field experience. Complainant did not have the preferred experience and background. (ROI, Exhibit 13)

Ms. Givins asserts that Complainant's application package was sufficient for him to be considered for the detail opportunity. However, whether Complainant had supervisory concurrence did not factor into their selection decisions. (ROI, Exhibit 13)

**Alyson L. Saben (age 47, DOB:** ▮▮1964; **no prior EEO activity), Director, Office of Global Engagement, GS-15, Office of International Programs, Food and Drug Administration (FDA),** states that she did not know Complainant, his age or whether he had prior EEO activity. She reviewed all applications and made the selection decisions for the detail position of Deputy Director, Office of Global Engagement, advertised under the Detail Opportunity. The detail opportunity announcement advertised multiple 60-day details on a revolving basis. All applications were forwarded to Vernelle Dewberry, Office of International Programs, who forwarded all applications to Ms. Saben. (ROI, Exhibit 12)

Ms. Saben testifies that since her position is new and she has a relatively large staff, she determined that she needed a deputy who could assist with the day-to-day operational and administrative functions of the office. She states that she needed someone who could review the quality of employees' work products, attend to time and attendance matters and otherwise hold employees accountable. It was an added benefit if the selectees also had great policy experience. (ROI, Exhibit 12)

Mr. Saben states that she received twelve applications; all had supervisory concurrences, except one. The Complainant's application was accompanied by his supervisor's concurrence. (ROI, Exhibit 12)

Ms. Saben states that she ranked applicants based on their skill set, with applicants who had generalist-type management and supervisory experience ranking highest. Applicants, including the Complainant, who had primarily a technical skill set, were not among the highly rated applicants. Two selections were made with both selectees having the desired management and supervisory skill set. The Complainant was not among the highly ranked candidates. His experience-background was technical. That was not the skill set that Ms. Saben needed for the detail position. While the Complainant had some management experience with the Navy, that experience was not recent. (ROI, Exhibit 12)

**Karen D. Smith (age and prior EEO activity not provided), GS13, Senior Management Officer, Center for Drug Evaluation and Research, FDA,** testifies that she received applications for the detail position "Unclassified Duties," Advertisement Tracking Number (ATM): CDER-11-150-OCTEC. She states that she does not know Complainant, his age or whether he has engaged in prior EEO activity. She received Complainant's application by email on August 29, 2011. Since the application did not contain supervisory concurrence, she did not forward it for selection consideration. She stated that she notified Complainant by email that his application would not be referred for selection consideration because it did not comply with the policy of the Center for Drug Evaluation and Research. (ROI, Exhibit 15)

**Lisa Romano (age 35, DOB:** ▮▮1976; **no prior EEO activity), Deputy Director (GS-15), Immediate Office, Office of Regional Operations, Office of Regulatory Affairs, FDA,** states that she does not know Complainant, his age or whether he has prior EEO activity. (ROI, Exhibit 14)

Ms. Romano states that she received all applications for the detail position of International Affairs Program Manager (Consumer Safety Officer, GS-696-14, Office of Regulatory Affairs, Office of Regional Operations, Immediate Office. She compiled the documents in a file and gave the file to the former Director of the Office of Regional Operations, David Elder. Mr. Elder reviewed the applications and made selections for the positions. Ms. Romano states that while she provided input on the applications that were received, such as who had prior experience in ORA, Mr. Elder made the selections. Mr. Elder is no longer with the FDA. (ROI, Exhibit 14)

Ms. Romano further states that Complainant's application did not contain evidence that he obtained supervisory concurrence. Nevertheless, his application was provided to the selecting official for consideration along with those of applicants who had obtained supervisory concurrence. (ROI, Exhibit 14)

Ms. Romano states that there were two primary factors used to make selections. Prior work history in ORA and prior work experience as an international liaison for either ORA or any FDA component. (ROI, Exhibit 14)

Ms. Romano states that the announcement was for multiple 60-day details, on a rotating basis and three selections were made. In each of the selections, the candidate had one or more of the preferred knowledge and background (knowledge of ORA and/or background in international forum). Complainant did not have the required knowledge and background in ORA or work in the international forum. Complainant had served a short detail in ORA, but that was in lab work and it was for a very short timeframe. The selected candidates' background was superior to that of Complainant. (ROI, Exhibit 14)

Ms. Romano testifies that Complainant's lack of supervisory concurrence did not play a role in the selection decisions. If a desirable candidate meets the selection criteria, they would then reach out to him/her and/or his/her supervisor to obtain supervisory concurrence for the detail. (ROI, Exhibit 14)

**Complainant's Rebuttal**

Complainant submitted rebuttal statements to the affidavits of Dr. Fabricant, Dr. Schneeman and Mr. Landa, as well as supporting documentation. Complainant's rebuttal is very detailed, but primarily reiterates points he raised during the investigation. He reiterates his point that Dr. Schneeman and Mr. Landa failed to properly address his allegations of a hostile work environment. Complainant disputes Dr. Fabricant's rationale for not selecting him for the NDI Team Leader detail position, and delivers a point by point denial of attributes which Dr. Fabricant uses as reasons for not selecting him. Complainant states that Dr. Fabricant's matrix is inconsistent with the duties described in the announcement. Complainant also states that Dr. Fabricant failed to reconcile assigning him duties connected to CoFS with his position description. (ROI, Exhibit F33-F35)

23

## V.   SURVEY OF THE GENERAL ENVIRONMENT

There were twenty (22) employees under Dr. Daniel Fabricant's supervision as of March 31, 2011, broken down by age groups, as follows:

| Age group | Number of Employees |
|---|---|
| Under 40 | 3 |
| 40-45 | 2 |
| 46-50 | 3 |
| 51-55 | 7 |
| 56-60 | 4 |
| 61 and above | 3 |

Complainant and a coworker (age 58, DOB: 4/8/1954) filed prior EEO complaints.

ROI, Exhibits Fa and Fb.

24

## INDEX

**TAB A:**          **FORMAL COMPLAINT DATA** (Source: Complaint File)

Exhibit A1          Formal Complaint of Discrimination of Kenneth M. Taylor, dated December 11, 2011

Exhibit A2:         Letter of Acknowledge of Receipt of Formal Complaint, dated December 16, 2011

Exhibit A3:         Amendment, dated January 27, 2012

Exhibit A4:         Amendment, dated February 6, 2012

**TAB B:**          **COUNSELING DATA** (Source: Complaint File)

Exhibit B1:         EEO Counselor's Report of Lindsey Kordish, dated November 30, 2011, with attachments

Exhibit B2:         Notice of Right to File a Discrimination Complaint, dated November 30, 2011

**TAB C:**          **DELINEATION OF THE ISSUES** (Source: Complaint File)

Exhibit C1:         Letter of Acceptance of the Complaint of Kenneth Taylor, dated February 8, 2012.

Exhibit C2:         Investigator's Letter of Authority, dated February 17, 2012

Exhibit C3:         Revised Letter of Acceptance, dated February 23, 2012

Exhibit C4:         Amended Letter of Acceptance, dated March 30, 2012

Exhibit C5:         Investigator's Letter of Authority, dated April 27, 2012

**TAB D:**          **DOCUMENTATION OF ATTEMPTS AT INFORMAL RESOLUTION**

**TAB E:**          **DOCUMENTATION OF APPELLATE ACTIVITY**