# AFFIDAVIT

**STATE OF:** South Dakota

**COUNTY OF:** Minnehaha

I, Robert Moore, PhD, make the following statement freely and voluntarily to Sylvia D. Drummond, who has identified herself to me as a Contract EEO Investigator for the Department of Health and Human Services, Food and Drug Administration, investigating a complaint of discrimination filed by Kenneth Taylor (hereinafter, Complainant), knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know). I hereby solemnly swear or affirm:

**1. What are your full name, current position title, grade, and organizational units (from smallest to largest)?**

I am no longer employed with the FDA; I retired in November 2011. I worked for FDA from 1994 until I retired. In my last position at FDA, I served as the Team Leader for the Dietary Supplement Regulations Implementation Team (DSRIT), Division of Dietary Supplement Programs (DDSP), Office of Nutrition, Labeling, and Dietary Supplements (ONLDS), Center for Food Safety and Applied Nutrition (CFSAN).

**2. Who were your first and second-level supervisors, by name and position title?**

At the time of my retirement, my first level supervisor was Dr. Daniel Fabricant, Director, Division of Dietary Supplement Programs (DDSP). My second level supervisor was Barbara Schneeman, PhD, Director, ONLDS, CFSAN.

**3. What was your organizational relationship with Complainant?**

I was Complainant's first level supervisor.

**4. Provide your age, date of birth, and indicate whether you have previously participated in EEO protected activity.**

I am 55 years old, and my date of birth is March 17, 1957. I have not previously filed an EEO complaint or otherwise participated in protected activity.

**5. Do you have any information about the background of the person who previously held the position as Team Leader for the NDI Team? Was he a toxicologist? Has it been the practice of the program to appoint toxicologists to head the NDI?**

The person who previously held the position as NDI Team leader, Dan Levy, had a chemical and microbiology (toxicology) background. In fact most of the members of the staff in the NDI group are microbiologists and toxicology-types. Since the primary purpose of the NDI team is to review safety data and make risk assessments, having individuals on the NDI team who specialize in toxicology makes sense.

**6. How long did you serve as Complainant's supervisor? While working under your supervision, did the Complainant perform duties that are related (directly or indirectly) to those performed by the NDI Team leader? Please explain your answer.**

I served as Complainant's first-line supervisor from the time he was hired to his current position. I do not know the exact date. To the best of my recollection, it would be about 9 years. During the time he worked under my supervision, he did not perform duties equivalent to those performed by the NDI Team leader. He did not prepare safety assessments or review safety assessments of NDI Notifications submitted to FDA. To my knowledge, as a member of DSRIT, he did participate in the NDI review process only in a capacity, as needed, of post-notification review of the marketplace to determine if a substance that was the subject of a notification was being marketed. As to any other tasks that may have been requested of him in conjunction with his participation in the NDI Team's as a DSRIT representative, I would have no knowledge of them since those activities did not require my approval or review.

**7. Are you familiar with the office's practice/policy concerning obtaining supervisory concurrence before submitting applications for details? If so, please explain.**

Generally, most detail announcements have supervisory concurrence as a requirement. However, there is no requirement that a supervisor grant concurrence. A supervisor may consider whether the individual's absence from the office will have a negative impact upon accomplishing the work of the office. It is not unheard of for a supervisor not to provide concurrence for a detail if the employee is needed in his/her current position.

**8. Are you familiar with the office's practice/policy concerning allowing employees to have witnesses present during one-on-one meetings with supervisors?**

I am not sure of the exact language in the Collective Bargaining Agreement (CBA), but it is my understanding that the CBA provides that supervisors are entitled to meet one-on-one with employees, without a witness, concerning work and assignments.

**9. Are you aware of instances when errors made by a DSRIT team member were circulated to the entire team? If so, please explain.**

While I was Team Leader, there were times when I needed to bring to everyone's attention that there was a policy change, I would communicate something to the effect that, "this is the way it was done... and this is the way it shall be done in the future." That may have involved sharing with all of the team members a particular work product completed by a team member, but the point in circulating it to all staff members would have been to put them all on notice. I cannot recall any specific examples of when this happened.

**10. Were you responsible for processing Certificates of Free Sales (CoFS) when you were DSRIT Team Leader?**

Yes, I processed CoFS. I took over those responsibilities around June 2006, when the employee who was CoFS project coordinator left FDA. I performed those duties for approximately two years. At that time, a new employee was hired to fill that position. That employee left the position in approximately late 2009-early 2010; at that time I resumed the task of completing CoFS requests until just shortly before I left FDA I performed these duties during the aforementioned time periods since we did not have Agency authorization to backfill the position.

**11. What percentage of your time did you spend processing CoFS? Did this work involve clerical duties?**

I probably spent about 25 percent of my time, at the most, performing duties in connection with CoFS. It is a fairly straight-forward process. It involves pulling the request, reviewing the labels for prohibited language and ingredients, and if there is no problem, the certificate is issued. At the point of issuing the certificate, the work is very clerical; it involves preparing the relevant documents, making copies of the documents issued, updating the database used to keep track of requests received and completed, mailing the documents to the requester, and filing the requests and related documents. However, the work is very simple, but I noticed that Complainant and other staff members appeared to be making it more complicated than need be. If one can type, then one can complete the work faster.

In anticipation of my retirement, Dr. Fabricant and I discussed what to do with the CoFS program. I recommended that the project coordinator responsibilities be assigned to Complainant. In effect, Complainant would be the "gatekeeper" logging in and tracking the work to ensure that is was being done by the DSRIT staff members assigned CoFS requests. When Dr. Fabricant held a meeting with the DSRIT staff concerning the added responsibility for CoFS, it was clear that staff were unhappy and felt that the job was beneath them. Complainant specifically raised the point that the person who previously performed the job was a GS-11. Both Dr. Fabricant and I informed the staff that I had been doing the job for years. Moreover, it is a job that must be done and there was no choice but for them to perform those duties until management is able to backfill the position.

Initials RSM

: 00125

**12. Do you have any reason to believe that Dr. Hilmas receives preferential treatment by being provided key assignments in DSRIT? If so, do you believe that age and/or prior are factors. Please explain your response.**

I do not believe Dr. Hilmas receives preferential treatment based on any discriminatory reason. Dr. Hilmas had worked closely with me in preparation of my retirement. At my recommendation, Dr. Fabricant and I had planned that Dr. Hilmas would temporarily take over my individual assignments and tasks when I retired. Dr. Hilmas was my "right-hand man," and inherited most of my unfinished business. Discrimination was not at issue in the decision to designate Dr. Hilmas as my temporary replacement. Dr. Hilmas was the best qualified to take over. Dr. Hilmas had been part of the NDI Team and has experience in regulatory policies and processes. Since I had worked directly with Dr. Hilmas in that he "shadowed" me for a period before I retired, I was aware of his knowledge and abilities to assume my duties on an interim basis when I retired.

**13. While you were employed with DSRIT, what was the office's policy or practice regarding scheduling meetings on employees' AWS (work at home) days?**

AWS is not an entitlement especially if there is a conflict with the operation of the office. I do not recall having an employee change his/her AWS schedule on a permanent basis. If a meeting had been scheduled on the employee's work-at-home day or off-day, I would have requested them to either come to work to attend or, at a minimum, call in.

**14. Do you have any reason to believe that Dr. Fabricant discriminated against Complainant based on age and prior EEO activity?**

No, I've never witnessed anything that would make me believe that Dr. Fabricant discriminated against Complainant in any way.

**15. Is there anything you would like to add?**

No.

Page 4 of 5

Initials

00126

I have read this statement, consisting of __5__ pages, and it is true, complete, and correct to the best of my knowledge and belief.

_Robert J Moore_
Signature

_4/19/2012_
Date

Signed and sworn to before me on this _19_ day of _April_, 2012 at _Crooks, SD_.

_[signature]_
Neutral witness, notary, or Investigator
Karl Hanson

Initials _RJM_

: 00127