## AFFIDAVIT

**STATE OF:** Maryland

**COUNTY OF:** Prince Georges

I, Daniel S. Fabricant, PhD, make the following statement freely and voluntarily to Sylvia D. Drummond, who has identified herself to me as a Contract EEO Investigator for the Department of Health and Human Services, Food and Drug Administration, investigating a complaint of discrimination filed by Kenneth Taylor (hereinafter, Complainant), knowing that this statement may be used in evidence. I understand that this statement is not confidential and may be shown to the interested parties (those with a legal right to know). I hereby solemnly swear or affirm:

I understand that the allegations under investigation are as follows:

Complainant alleged discrimination on the bases of age (47, October 15, 1964), and a hostile work environment and retaliation for participating in the EEO process when he complained to the union (the NTEU) and filed an EEO complaint with the OEEO on November 14, 2011. The claims include:

(a) On January 27, 2012, Dr. Fabricant notified Complainant that he selected Ms. Ramadevi Gudi for the Acting Team Leader detail that Complainant applied for. The Complainant has 11 years of FDA regulatory policy experience in dietary supplement work and Ms. Gudi has 18 months of FDA experience in the same area.

(b) On January 27, 2012, Dr. Fabricant required Complainant to meet with him one-on-one without a witness in the room. The witness was a requirement of the FDA EAP Counselor.

(c) On January 24, 2012, Dr. Fabricant intentionally sent an e-mail to the entire Dietary Supplement Regulations Implementation Team showing them an alleged mistake Complainant made on an export certificate package. Dr. Fabricant failed to contact Complainant prior to sending the e-mail containing the mistake to the team.

(d) On September 1, 2011, Complainant's ability to obtain a work detail was obstructed because Dr. Daniel Fabricant refused to give his concurrence for any of the detail assignments that Complainant applied to.

(e) From August 2011 to October 2011, Complainant's terms and conditions of employment and work assignment duties were altered to be

inconsistent with his position description as a Chemist, grade14. The duties were changed to those of a clerical employee, grade 9/11, including, receipt dating, assigning invoice numbers, entering requests into the database, preparing copies, printing, addressing envelopes and mailings.

(f) From July 20, 2011 to October 31, 2011, Complainant was forced to alter his work hours and telecommuting schedule to accommodate meetings set by Dr. Fabricant. On July 20, 2011, Dr. Fabricant scheduled a one-on-one PMAP meeting on Complainant's telecommuting day. Dr. Fabricant ignored Complainant's request to reschedule the meeting. On October 27, 2011, Dr. Fabricant scheduled the weekly team meeting for 9:00 AM which interfered with Complainant's 9:15 AM arrival time. On October 31, 2011 Dr. Fabricant scheduled the weekly recurring team meetings on Mondays, which is Complainant's regular telework day.

(g) On March 14, 2011, Dr. Fabricant made derogatory comments to Complainant regarding his age such as, "You have a problem with age;" and, "Someone who has been around as long as you have should have ideas."

(h) On February 27, 2012 Dr. Fabricant allowed Corey Hilmas to create a hostile work environment for Complainant when he allowed Dr. Hilmas to yell at Complainant during a team meeting, in front of Complainant's peers.

(i) Between February 24 and 29, 2012, Dr. Fabricant assigned Complainant to data mine electronic files of documents, sort them electronically, and email approximately 250 data files, which were assignments outside of Complainant's responsible duties.

**1. What are your full name, current position title, grade, and organizational units (from smallest to largest)?**

Daniel S. Fabricant, Director, Dietary Supplement Program (DDSP), Office of Nutrition Labeling and Dietary Supplements (ONLDS), Center for Food Safety and Applied Nutrition (CFSAN).

**2. How long have you been in this position?**

Slightly over one year.

**3. Who are your first and second-level supervisors, by name and position title?**

My first level supervisor is Barbara Schneeman, PhD, Director, ONLDS, CFSAN. My second level supervisor is with Michael Landa, Director, CFSAN.

**4. What is your organizational relationship with Complainant?**

Initials _DF_

: 00098

I am acting as Complainant's first level supervisor while the permanent team leader position is filled. I have supervised Complainant since July 2011. Prior to that, Dr. Robert Moore, Team Leader, DSRIT, was Complainant's first level supervisor.

**5. Provide your age, date of birth, and indicate whether you have previously participated in EEO protected activity.**

I am 36 years old, and my date of birth is August 8, 1975. I have not previously filed an EEO complaint, and have not served as a witness in an EEO complaint.

**6. Complainant alleged that he engaged in protected activity when he complained to you on July 18, 2011, that you were in violation of the CBA when you scheduled staff members during non-core hours. Did Complainant make this complaint to you?**

Complainant mentioned that meetings should not be scheduled outside of core hours. I did not consider his statement anything more than just an employee expressing dissatisfaction with what was proposed. I note that I did not actually hold any staff meetings outside of the core hours. In addition the CBA makes concessions regarding meetings outside of core hours.

**7. Were you aware that Complainant initiated an EEO complaint on November 14, 2011? If so, when and how did you become aware?**

Yes, I was aware that the Complainant initiated EEO counseling. I was contacted by the EEO Counselor and interviewed on November 17, 2011. The EEO Office also notified me on February 9, 2012, that the Complainant had filed a formal EEO complaint. The EEO Office also notified me on February 23, 2012, that Complainant had amended his formal complaint.

*Incidents a and d – not selected for detail and denied detail opportunities*

**8. Where you the selecting official for the detail position of Acting Team Leader, NDI?**

Yes, I was the selecting official for the position at issue.

**9. Were other agency officials involved in the selection process for this detail?**

No.

**10. Please describe the process by which you made your selection decision?**

I reviewed applications and assessed applicant's qualifications against my matrix, which included: (a) demonstrated leadership skills; (b) the ability to work as part of a team, (c) similar pre-market-type regulatory knowledge and experience (i.e. experience in new

Initials *DJF*

dietary ingredient), (d) experience/expertise in toxicology and (e) their scientific relevance.

**11. Did you retain notes or make any other written documentation of your selection process? If so, please submit those documents for the record.**

Yes. These were submitted by email.

**12. Who did you select and why?**

I selected Ramadevi ("Rama") Gudi, PhD, because, when measured against my matrix, she was the superior candidate. As detailed in her resume, Dr. Gudi has approximately 16 years of director/management experience outside of the agency managing a diverse group. Dr. Gudi's outside experience is directly related to the work that is performed by the NDI team. Because of the nature of the work performed in NDI, the team has historically been managed by a toxicologist. Dr. Gudi has world-wide recognition as a first class toxicologist. Furthermore, Dr. Gudi has worked for the NDI team for almost two years and had often acted as Team Leader in the absence of the former Team Leader.

**13. The Complainant alleged that he was the only candidate who had performed all of the duties related to the NDI Team Leader Position. Please explain why did you not select Complainant?** *Also, insert response to Complainant's allegation that he was the only candidate who performed all of the duties of the NDI Team Leader Position.*

Complainant was not the best candidate. While he has expertise in chemistry and regulatory experience, he is not a toxicologist by training or experience. The Complainant has not demonstrated to me that he works well as a team member. He is often disruptive and expresses unhappiness about his job, e.g., he tells employees in the office that he is going to "get" me; he has lashed out at a secretary Bertha Stanley, he constantly broods; and he was reluctant to comply with my request for access to his electronic calendar. When the Complainant had his introductory one-on-one with me, he was non-responsive to my requests for his ideas about improvements in the operation of the office. Rather, he commented that it was not his responsibility to set the vision for the Director. Complainant also commented at that time that he believes that the Deputy and Director positions should be fired as that is the only way to improve the Office and Division.

In addition, we have also received emails from firms complaining that he is non-responsive to their requests. He often puts inflammatory statements in FDA emails, that if were ever revealed to the public would be concerning for the agency. Complainant has also sent emails indicating that he is struggling with his assigned duties. Based on

these considerations it seemed difficult to reach the conclusion that he would be able to successfully serve as Team Leader for the NDI team.

Per his CV the complainant had not done safety reviews, which are critical to the role of team lead for NDI review. Additionally, the NDI team lead should be credible and widely respected on scientific matters external to the agency. The complainant's last scientific publication per his CV was 1995.

Initially I believe the complainant's allegation was that the position was for those with FDA supervisory experience only, from the detail notice, that clearly wasn't the case. I believe he has since changed his allegation. That seemed consistent throughout the process.

**14. Please respond to Complainant's contention that you pre-selected Dr. Gudi for the NDI Team Leader position.**

I did not pre-select Dr. Gudi. For reasons stated above, I selected Dr. Gudi because she was the best candidate. Additionally, per Complainant's allegation that he was discriminated on based on age, I have since come to find out that Dr. Gudi is older than the complainant.

**15. Regarding Complainant's allegation that you "obstructed [his] ability to obtain a work detail," by refusing to provide him with supervisory concurrence, please explain why you did not grant the Complainant's request.**

I did not deny Complainant's request for supervisory concurrence. I explained to Complainant that supervisory concurrence was not required in order for him to apply for a detail, as that isn't CFSAN's standard policy. Also, it was not a requirement for the NDI Team Leader detail which I advertised. While I did not believe my concurrence was required, I did in fact give it to him on earlier requests. Specifically, I sent an email to Complainant instructing him to go ahead and submit his applications and I wished him luck for 3 detail announcements. Thus if he needed it, it is certainly reasonable to believe that had he asked it would have been granted as I also in a counseling meeting with the employee told him that I would do all I could to help him in looking for and obtaining a detail as he told me he was interested in going elsewhere. Additionally, during that meeting I brought up a detail that the complainant had applied for without my knowledge or concurrence in the Office of Food Additive Safety. Specifically that the Acting Director of Food Additive Safety, Dennis Keefe, was unsuccessful in reaching Complainant regarding his application for an earlier detail. Mr. Keefe called me in his efforts to reach Complainant.

If the announcement in question required supervisory concurrence, I would not have known as the complainant did not share the actual announcement with me nor did he make it known by responding to my statement that it wasn't required with a correction. It seems that if he had wanted something different than my written and verbal encouragement for him to go ahead and submit his application, he would have asked

Initials *DSF*

00101

for more and he would have shown me the actual detail announcements reflecting the requirements for applications.

**16. Have you provided other employees under your supervision with a letter of concurrence to accompany their applications for detail assignments?**

I do not recall anyone asking for concurrence in advance of submitting their application.

**17. Excluding the position of Acting Team Leader referenced earlier, were you involved in the selection process for any of the other detail applications submitted by Complainant from September 2011 to January 27, 2012?**

No.

*Incident 2 – required to meet one-on-one with a witness*

**18. What was the reason for your January 27, 2012 meeting with Complainant?**

I scheduled the meeting to discuss with Complainant the way he was distributing Certificates of Free Sale (COFS) to staff members. I had noticed that these assignments did not appear to be made in an equitable fashion. Certain employees were receiving more than their fair share.

**19. Did the Complainant request to have a witness present? If so, what was your response and why?**

Yes, Complainant requested to have Linda Webb attend the meeting as a third party witness. I denied his request because Ms. Webb does not have recognition by the Human Resources or the Union to serve as a third party in meetings between managers and supervisors. Ms. Webb is one of complainant's co-workers in DSRIT.

**20. Did Complainant inform you that his EAP Counselor recommended that he only attend one-on-one meetings with you if accompanied by a witness?**

Yes, Complainant provided me with this information after I questioned him regarding having Ms. Webb serve as a witness to our meeting. Notwithstanding my right as a manager, in accordance with the CBA, to meet with employees one-on-one to discuss and counsel them on work issues, I attempted to accommodate Complainant's wishes. Specifically, I informed him that we could look into getting a mediator, or someone who was sanctioned to serve as a third party, to attend the meeting with him. Complainant rejected my alternative solution. Complainant was struggling in equally distributing assignments for months, which combined with other errors, the matters needed to be addressed sooner versus later.

Page 6 of 14                                                                 Initials DSF

: 00102

**21. Are other employees under your supervision permitted to have witnesses present during one-on-one meetings with him?**

I do not specifically recall that any other employee has requested the presence of a witness during my one-on-one meetings with them. If any employee requested the presence of a third party, it would have been a party sanctioned by Employee Relations or the Union to serve as a third party.

**22. Please respond to Complainant's allegation that you had a witness present during the meeting. Specially, Complainant alleged that you left your office door open while Dr. Corey Hilmas sat immediately outside of your office.**

I did not have a witness present, nor did I request that Dr. Hilmas sit outside of my office. I do not specifically recall if he was there. If Dr. Hilmas was outside of my office, he was probably reviewing the stacks of new dietary ingredient notification draft guidance comments which are stacked outside of my doorway. We received 7 bank boxes full of comments.

**23. Did you specifically ask the Complainant whether you could leave the door to your office open during your meeting with him?**

I believe I asked the Complainant whether he wanted the door open or closed, and he responded that it was okay with him to leave the door open.

*Incident 3 – email to DSRI Team re error on export certificate package*

**24. Did you circulate a January 24, 2012 email to the DSRI Team showing them an error Complainant made on an export certificate package? If so, please explain why you circulated the email to all team members.**

On January 24, 2012, I sent an email to all DSRIT members reiterating my previous November 8, 2011 email instructions to use the appropriate templates with the appropriate signature block. I again attached the correct template as well as the one that was processed with the incorrect signature block. Dr. Schneeman's name appeared on the incorrect signature block; my name should be inserted.

I circulated the email to re-enforce the importance of using the correct templates when corresponding with industry. I believed that the entire team would benefit from my re-statement of this point. There needed to be an immediate end to the practice of sending out correspondence with the incorrect signature block as that practice should have been corrected almost 3 months prior. The complainant apologized by email but stated by email he felt he was called out, I told him his name was not mentioned in the email so that didn't appear to be the case from my vantage.

**25. Please respond to Complainant's contention that you should have contacted him prior to sending the email.**

Initials *DJT*

I believed that the entire team would benefit from my re-iteration of this point. I wanted an immediate end to the practice of sending out correspondence with the incorrect signature block. The complainant was not named in the email.

**26. Have you circulated similar emails to the entire team that showed errors made by other team members? If so, please provide details.**

I also forwarded a similar email regarding problems with another employee, Linda Webb. On another occasion, during a team meeting, I discussed a problem with an employee who had effectively sent out a warning letter to a firm, without going through the proper channels. During staff meetings, we also have had discussions regarding policies and practices within the office. It is very likely that some of these discussions would have centered on staff members who were not adhering to those policies/practices. My intention is never to embarrass, harass or otherwise discriminate against any employee. Other emails have been forwarded that speak to that.

*Incident 5 – work assignments*

**27. The Complainant alleged that during the period August 2011 to October 2011, you altered his duties to include GS 9/11 clerical duties. Please provide an explanation and justification of any changes to Complainant's regular assignments you have made during this period.**

I assigned Complainant to serve as the coordinator for the CoFS project. Complainant's duties may contain some clerical components, but the duties are not strictly clerical. As coordinator of the CoFS project, Complaint is responsible for tracking CoFS and assigning them to other DSRIT staff members for processing. The Complainant is also responsible processing CoFS.

Prior to assigning this work to Complainant, Dr. Robert Moore, the former Team Leader, DSRIT, performed these duties for approximately 3 years. It is significant to note that Dr. Moore performed these tasks and completed them within 6 hours per week. Considering the fact that I do not have additional FTEs, when Dr. Moore left, it became necessary for me to assign the duties to other staff members. Accordingly, I designated Complainant as the coordinator, and assigned all members of DSRIT to process CoFS, including Complainant.

It is interesting that when the Complainant submitted his application for the NDI Team Leader detail, he seemed to be proud to tout his responsibilities as coordinator for the CoFS program.

**28. Is it true that Complainant's role as coordinator for CoFS is a full time job, which means he does not have time to perform other duties?**

Initials _DSF_

: 00104

I do not believe that the Complainant's responsibilities in this area should require him to work full time. Dr. Moore previously performed the duties working 6 hours per week, while process all of the CoFS. The Complainant is not required to process all of the CoFS; rather, they are distributed to other team members.

**29. Have similar changes been made to other employees' duties? If so, please explain.**

As I stated earlier, all members of DSRIT were given additional responsibilities after Dr. Moore retired. They were all assigned to process CoFS in one way or another. I too have to review and sign off on all rejection letters for CoFS; the task at hand has to get done.

**30. Regarding Complainant's allegation that you gave Dr. Hilmas preferential treatment by providing him with key assignments, did you designate Dr. Hilmas to attend the AOAC SCS/USP Conference on October 6-7, 2011?**

Yes, I designated Dr. Hilmas to attend and present at the conference. Notwithstanding the Conference Organizer's (Dr. Sumit Sen) invitation for Complainant to present, when I spoke with Dr. Sen, he informed me that he was interested in having someone speak about the new NDI draft guidance. Originally, we discussed the possibility of me making the presentation since I was well versed on the subject. However, the dates were not convenient for my schedule. Accordingly, I designated the next best person to make the presentation, Dr. Hilmas. Dr. Hilmas was intimately involved in writing the new NDI draft guidance and could speak to labeling. On the other hand, complainant played no role in writing the NDI draft guidance which is a controversial item.

**31. Did you assign Dr. Hilmas the task of responding to the Citizen's petition on the regulatory status of Pyridoxal-5Prosphate (P5P)?**

No, I did not ask him to respond to the petition. Complainant performed all work related to that task. I then asked Dr. Hilmas to shepherd the comments through the approval process. Dr. Hilmas works well with the office that has responsibility for approving the comments. That was Dr. Moore's prior role in which Dr. Hilmas is currently performing a detail.

**32. The Complainant alleged that you relieved Dr. Hilmas of responsibility for processing export certificates, which is a requirement of his (Dr. Hilmas') position description, and that Dr. Hilmas is receiving credit for work that Complainant performs related to processing export certificates. Please respond to these allegations.**

Dr. Hilmas and I review all rejection and hybrid (partial rejection) letters for Certificates of Free Sale before they go out the door, so he is still working on processing Certificates just in a different capacity. In addition, Dr. Hilmas processed a significant number of Certificates per the attachments so like anyone else on the team, all work is

documented appropriately for performance review considerations, and no one receives credit for other's work.

**33. While he was unable to provide details of other work being performed in the DSRIT, the Complainant alleged that Dr. Hilmas is given all of the significant assignments, e.g., Dr. Hilmas in involved in "responses to comments on the draft dietary supplement liquids and new dietary ingredient guidances, JIFSAN webinar, meetings and projects related to topics that include economically motivated adulteration, mobile field lab assignments, the National Council of Prescription Drugs structured product labeling, and ephedrine alkaloid seizures, and assisting other agencies such as the Department of Justice and the Federal Trade Commission." Is Dr. Hilmas involved in working on the projects described by Complainant? Why Complainant has not been assigned responsibility to work on these assignments?**

Dr. Hilmas is serving in Dr. Moore's former role as a detail and also performing additional duties that Dr. Moore previously did not. We have promulgated more actions with Dr. Hilmas in his role than we had in the previous year.

The complainant didn't apply for the detail, in which he could have performed some of these duties and also didn't perform these sorts of activities (enforcement/compliance) under Dr. Moore's supervision prior to my arrival. Additionally, the complainant is self-admittedly struggling with certificates of free sale and extending what was once completed by one person in six hours a week into a full 40-hours of work for the complainant plus time by other staff members devoted to the task, thus it would appear that he may have some difficulty taking on additional items. He was so overwhelmed by these duties at one point that that he intimated to me that he sought EAP counseling. Additionally, the complainant has said in DSRI Team meetings that he isn't interested in policy or enforcement type activities or discussion when these topics are brought up. He has not approached me with an interest in taking on additional duties.

*Incident 6 – Altered AWS*

**34. Did you schedule a meeting with Complainant on a day that he was scheduled to telecommute – July 20, 2011? Did Complainant request a change in the meeting date? What was your response and why?**

On June 20, 2011, I scheduled a 9 a.m. July 25, 2011 (Monday) meeting with Complainant. While I was generally aware that Complainant had telecommute days, at the time it did not occur to me that Monday was a telecommute day. I wanted to discuss Complainant's PMAP, and Monday was the most convenient day for me. I had no intent

to inconvenience Complainant, and he was granted another telecommute day. The meeting was originally scheduled for 9 a.m., but when Complainant notified me of his customary arrival time, I changed the meeting time to 10 a.m. to accommodate him.

Complainant requested that we change the meeting date, but as I said previously, Monday was the most convenient day for me to meet with him. My decision to schedule the meeting for a day is consistent with the CBA. Complainant made up his flex day later in the week.

> 35. Did you schedule an October 21, 2011 staff meeting that began at 8:00 a.m., and an October 27, 2011 meeting that began at 9 a.m.? If so, was Complainant required to attend? Were these meetings DSRIT staff meetings?

Advance notice of these meetings was given and management is to the extent possible, when feasible, allowed to schedule meetings outside of core hours should the need arise. I thought it was very feasible for the complainant to be at the first team meeting, as he is part of the team. The meetings were originally scheduled for the dates and times above but didn't take place to accommodate the complainant, so no effects were felt by the meetings initially being scheduled for those times. The Complainant requested to be able to attend staff meetings via teleconference. I denied his request because I feel strongly that it is important to bring staff together in an effort to promote team work, as that didn't happen prior to my arrival. I especially was interested in all of the staff being present in the office during the very first staff meeting so as to get things up and running. I wanted the office to function as a team, which it had not done in the past.

I did not hold any meetings during non-core hours, I ensured that no staff meetings were scheduled outside of the core hours.

> 36. Did Complainant request an accommodation in arrival time or scheduling of the weekly team meeting so that he would not have to alter his work schedule? If so, what was your response and why?

The Complainant requested to be able to attend staff meetings via teleconference. I denied his request because I feel strongly that it is important to bring staff together in an effort to promote team work. I especially was interested in all of the staff being present in the office during the very first staff meeting so as to get things up and running. I wanted the office to function as a team, which it had not done in the past.

I did not hold any meetings during non-core hours, I ensured that no staff meetings were scheduled outside of the core hours.

Initials

00107

**37. Were other staff members' schedules similarly affected by your scheduling of meetings? If so, please provide details.**

I do not believe that any other schedules, except mine, were altered as a result of the recurring Monday staff meeting. However, Monday was the most convenient date for the majority of the group, it seemed to have a lesser overall impact on the entire team. Complainant chose a different telework day. Complainant has not brought up the change in days as a problem to me at present.

I prefer early morning staff meetings so that the remainder of my day can be devoted to other priorities and we can use core hours to do business we have to do with other offices and centers within FDA and the federal government.

*Incident 7 – derogatory comments regarding age*

**38. Please provide information on the context in which your March 14, 2011 conversation with Complainant took place?**

The March 14, 2011 meeting was my introductory one-on-one meeting with the Complainant. During our discussion, the Complainant asked numerous questions that seemed to center around a timeline that defined my age. I did not say that he has a problem with age; rather, I said "you seemed obsessed with my age, my age is very important to you." It wasn't a derogatory statement about age. Instead, it was my observation of Complainant's conversation with me.

**39. To what were you referring when you stated that "someone who has been around as long as you should have ideas?"**

The complainants allegation is false I didn't say the words **"someone who has been around as long as you should have ideas"** I had asked the Complainant if he had any ideas about ways to better accomplish the mission of the office, whether he had any ideas about standard operating procedures, etc. He stated that he did not have any ideas. I responded to him that someone who has been with the Division for about 10 years, which is a good amount of time, probably has and should have ideas about ways to improve the organization. My comment had nothing to do with his age; I was only referring to his background with the organization. It is interesting that the only idea he could come up with was that the agency should get rid of the Deputy and Office Director [my supervisor's and her deputy's position] positions.

**40. Respond to Complainant's contention that you allowed Corey Hilmas to yell at him during a February 27, 2012 meeting.**

During the February 27, 2012 meeting, we were discussing policy and compliance issues. Dr. Hilmas and Dr. Taylor were disagreeing on a point related to what products

Page 12 of 14                                                                 Initials  DJF

: 00108

the office should review. The two were expressing different opinions and the discussion went back and forth. Dr. Hilmas has a loud voice, but was not yelling at Complainant. The Complainant repeatedly asked Dr. Hilmas not to yell at him and Dr. Hilmas repeatedly responded, "I am not yelling." I did not consider the exchange to be anything more than two employees who were expressing different opinions on a work-related matter. I do not believe that there was any hostility or any intent to subject Complainant to a hostile work environment. Complainant did not complain to me that he believed that he was subjected to a hostile work environment. When the meeting ended, I believed that the matter was over. The complainant's emails indicate that he is quick to insult people, and has a history of yelling at members of DDSP so if anything I find it odd in that he is portraying himself as a victim in these allegations.

**41. Respond to Complainant's assertion that you assigned him duties that were "outside his responsible duties" when you assigned him to "data mine electronic files of documents, sort them electronically, and email approximately 250 data files."**

These duties were related to CoFS, and accordingly, were well within the purview of Complainant's responsibilities. The assignment was very simple it was to use the search function on Microsoft to find hybrid letters for an electronic interface for CoFS. Interestingly enough the complainant failed to accomplish the task on time, despite receiving specific instructions on how to perform it and given days to complete it. Dr. Hilmas performed the task in 20 minutes so we could make our deadline.

**42. Has the Complainant complained to you and/or other agency officials concerning his allegations of harassment? If so, to whom did he complain, when, and what was the outcome?**

I am not aware of any alleged harassment problems being brought to the attention of higher management. I do know that the Complainant has made statements that he is going to "get me" and made allegations to others about me. He has also spoke freely to others in the Division about filing an EEO complaint against me, he seems proud of that fact. The Complainant has not directly confronted me with allegations of harassment.

**43. Did you discriminate against Complainant based on age and/or reprisal?**

No, never, complainant has never been based on age, reprisal or any other reasons discriminated against. I believe that Dr. Gudi, who was selected for the NDI Team Leader position is older than Complainant. Also, I believe that Dr. Hilmas is around the Complainant's age.

**44. Is there anything you would like to add?**

Complainant has looked to incite and spread gossip about me in an inappropriate manner. In consideration of such actions by the complainant and all the materials provided it appears the complainant is abusing the EEO system to make matters

: 00109

personal, at the expense of my reputation, which is unfortunate. I have attached a memo but removed the name of the DDSP staff who sent it. I would like it to be considered for the record, to demonstrate the character and motives of the complainant.

I have read this statement, consisting of _____ pages, and it is true, complete, and correct to the best of my knowledge and belief.

_____
Signature

5/7/12
_____
Date

Signed and sworn to before me
on this ____ day of _____, _____,
at _____.

Received by Sylvia A Drummond
DS2 on 5/7/2012

_____
Neutral witness, notary, or Investigator

Page ___ of ___

Initials _____